Argued October 7, 1936; defendant placed on probation
January 5, 1937

## In re BOOTHE
(63 P. (2d) 905)

In Banc.

Will H. Masters, of Portland, for Oregon State Bar.

J. F. Boothe, of Portland, in pro. per.

CAMPBELL, J.  A short time prior to September —, 1933, Henry Cully died intestate in Multnomah county, Oregon. At the time of his death, he had on deposit in a savings account in the East Side Branch of the First National Bank of Portland, the sum of $3,778.80; he had on deposit in a savings account in the First National Bank of Portland the sum of $8,671.80. A few days prior to his death, he delivered to Mrs. W. C. Morrison, his step-daughter, the passbook covering the deposit in the First National Bank. The record does not disclose the purpose for which this passbook was given to her.  Two or three days

after his death, Mrs. Morrison, after consultation with her husband, visited the office of J. F. Boothe, an attorney of this court, for advice regarding the disposition of the passbook; left the passbook in the possession of the attorney and instructed him, if proper, to turn it over to the administrator of the estate of Henry Cully, deceased, when one should be appointed. After looking into the matter, the attorney concluded that the delivery of the passbook was a gift *inter vivos* from the owner of the account to Mrs. Morrison.

In the meantime, George Gradt had been appointed administrator of the estate of Henry Cully, deceased, and claimed the money on deposit as such administrator.

Mrs. Morrison thereupon entered into a contract with the said J. F. Boothe whereby she employed him to endeavor to recover the said money for herself individually. The contract, among other things, provided:

"It is hereby agreed that the party of the first part employs the party of the second part, as her attorney to recover said money and the accumulated interest thereon, and to take such proceedings as may be necessary in the premises, and the party of the second part accepts said employment on the following terms and conditions: He is to perform all legal work and proceedings whether in or out of court, and for his services he is to receive one-third of the amount of money recovered, either by suit or compromise. That no compromise shall be made except as directed by the party of the first part, in writing. If nothing is recovered the party of the second part shall make no charge against the party of the first part for his services so performed. In other words, his payment is contingent on success in recovery, and the party of the first part authorizes party of the second part to receive and receipt for said money when, and if recovered, and to sign any neces-

sary receipt of acquittance that he may do as an attorney at law.''

The said J. F. Boothe thereupon made a demand in behalf of Mrs. Morrison on the bank for the money represented by the said passbook.

The First National Bank, being thus advised of the conflicting claims, filed a suit in the circuit court for Multnomah county for the purpose of determining the ownership of the money on deposit, as shown by the said passbook, making the administrator and Mrs. Morrison parties defendant.

Thereafter the parties defendant filed their respective answers setting up their respective claims. The answer of Mrs, Morrison was filed by Mr. Boothe. The cause came on for hearing, and after a trial lasting for several days, the court entered a decree adverse to Mrs. Morrison, and entered a judgment against her for the costs of the suit in the amount of $52.60. Mr. Boothe contends that he quite promptly thereafter gave notice of appeal and got the court to amend its decree with a provision that:

''It is further ordered that the said money shall remain in the possession of the Clerk of the Court pending the decision of the Supreme Court, notice of appeal having been given. If no appeal perfected within the time, then the money is to be paid over as herein provided.''

Mrs. Morrison testified that as soon as the trial was over, she notified Mr. Boothe that she would have nothing more to do with the suit, and to drop the matter. This is denied by Mr. Boothe. Mr. Boothe entered into negotiations with the attorneys for the administrator, and they offered to compromise the case by treating Mrs. Morrison as one of the heirs to the estate, although in law she had no inheritable interest. There were

seven other heirs, either direct or by representation. They thereupon deducted the costs of the suit, including a fee of $350 for the bank, a fee of $750 for the attorneys for the administrator, and some other minor costs, and divided the balance of the estate into eight equal parts. This would have entitled Mrs. Morrison to the sum of $956.22. Mr. Boothe promptly accepted the proposition on behalf of Mrs. Morrison and the money was then released by the circuit court and Mr. Boothe was paid the above mentioned sum. Of these facts, there is no dispute.

Mr. Boothe then notified Mrs. Morrison that he had made a settlement and for her to come into his office. In due time she came to his office, and on that date Mr. Boothe paid her $100 in cash and satisfied the judgment for costs, and agreed to take care of the fees of a witness subpoenaed on behalf of Mrs. Morrison in the interpleader suit. Mr. Boothe took her receipt for the money as follows:

"                    Portland, Oregon, November 26, 1936

Received from N. F. Boothe One hundred and Fifty two and 60/100 Dollars, being $100. in cash paid me this day, and $52.60 for costs taxed against me in the case of First National Bank of Portland, Oregon, Vs. George Gradt, administrator and myself, concerning the Cully case, which costs Mr. Boothe has paid for me, and in full for all that I was to receive in the adjustment and settlement of an appeal, and for a dismissal of the appeal.

(S) Carrie E. Morrison."

Mr. Boothe claims that at the time of the particular transaction, he offered to go into the details of the settlement and the amount received by him, but was informed by Mrs. Morrison that she cared nothing for those things; that she was satisfied with the $100; that it was more than she expected to receive.

Mrs. Morrison claims that she requested Mr. Boothe to inform her of the full amount that he had received in the settlement, and that he put her off by saying that he received "very little". She further states that she signed the receipt hurriedly and without reading the same. She further claims that the arrangements made by the administrator with Mr. Boothe was not a compromise or a settlement but merely a gesture of good will on the part of the administrator and the heirs of the H. Cully estate.

Sometime thereafter, she complained to the Grievance Committee of the Oregon State Bar, and on January 6, 1936, said Grievance Committee filed with the Board of Governors of the Oregon State Bar a complaint which substantially relates the undisputed facts above mentioned, and complains:

"* * * that said J. F. Boothe wrongfully, deceitfully and fraudulently concealed from the said Mrs. W. C. Morrison the facts relative to the said matter and concealed from her the amount of said settlement and wilfully deceived and fraudulently failed to account to her for the funds, moneys and credits coming into his possession by reason of said settlement."

Thereafter a hearing was held before the trial committee of the Oregon State Bar for the district for Multnomah county. After hearing, the trial committee made findings of fact which, omitting the unimportant parts, are as follows:

"We find that the accused attorney was guilty of unprofessional conduct in not making a full disclosure to his client as to all the facts of the settlement entered into with the Cully estate. We make no finding as to whether the accused attorney was entitled to a fee, and if so, the amount thereof."

The said committee then recommended that the said J. F. Boothe be reprimanded and placed on probation

for a period of 12 months, and that the charges against him be not dismissed in the meantime.

These findings and recommendations were filed with the Board of Governors and served on the complainant, Mrs. Morrison, and the attorney Mr. Boothe. Thereupon Mrs. Morrison filed a letter with the Board of Governors advising them that in her judgment, "the recommendation as given by the TRIAL COMMITTEE is not too severe, in fact not severe enough * * *" and " to urge the BOARD OF GOVERNORS to not be lenient with the accused attorney but to impose as severe a penalty as is possible and practicable".

Copies of this paper were served upon the accused and upon the chairman of the Trial Committee.

Thereafter the Board of Governors held a meeting, and without a further hearing and without any additional testimony being taken, approved the findings of the trial committee, and by a resolution adopted by a two-thirds vote, recommended to this court "that the said J. F. Boothe be suspended from the practice of law for a period of six months * * *".

Thereupon a transcript of the proceedings was filed in this court and the said J. F. Boothe notified. Thereafter, and within 60 days, the said J. F. Boothe petitioned this court for a review of the proceedings and asked that the recommendation of the Board of Governors be not adopted. The cause was argued before this court on October 7, 1936.

The evidence on the disputed points is unsatisfactory. Mrs. Morrison is a woman of seventy-two years of age and has had some experience in legal matters. In the past, she has owned property in Portland, on which she has paid taxes, city liens, such as sewer assessments, etc. Her husband with whom she is living, and with whom she advises, appears to be a

man of average learning and ability in the transaction of business.

As to the matter of the authorization of the appeal, Mrs. Morrison testified:

"MR. MASTERS (continuing): Now, Mrs. Morrison, after you were beaten in Judge Kanzler's court on this case, did you have any conversation with Mr. Boothe with regard to an appeal in that matter?

A. Yes, sir, he wanted to appeal it, and I said 'No'.

Q. (By Mr. Knight): You didn't do it?

A. No. He said he thought if he were to appeal it we would get something out of it."

Q. * * * did you know anything about his appealing this case?

A. Yes sir, he wanted to appeal it. He spoke about it.

Q. Did you know whether he had appealed it?

A. No sir, he didn't, and he never had orders to appeal it.

"Q. (continued by Mr. Masters): You always refused to have anything to do with that?

A. Certainly.

Q. How did you happen to come over to his office when the hundred dollars was paid to you?

A. He called me on the telephone and asked me to come.

Q. He telephoned to you to come on over and get the hundred dollars? What was said between you and Mr. Boothe?

A. He gave me a hundred dollars.

Q. Did he say why he was giving you the one hundred dollars?

A. He said that is all he got out of it. He said he bluffed that out of the attorneys.

Q. Did you ask him how much he had gotten?

A. I did.

Q. What did he say?

A. Not very much; not as much as he should have gotten.

Q. Did he at any time tell you how much he had gotten out of this suit?

A. No sir.

Q. When did you know first,—when did you first discover that he had obtained $900 from a settlement?

A. Well, that was some time last fall.

* * *

Q. Did you then go to Mr. Boothe again?

A. I did.

Q. What conversation took place at that time between you and Mr. Boothe?

A. I asked him, but he still would not say how large a sum,—how much he had got. When I left I asked him what he was going to do about it, and he said 'Nothing'. He said he had paid $300 to the bondsmen, and he said he was going to do nothing about it, and he was not going to give them the money back, because he had earned it.''

In speaking of the receipt that she signed at the time the petitioner paid her the $100, she testified:

''Q. You say that you didn't sign it (the receipt)?

A. What is it?

Q. Did you say that you didn't read it, or that it wasn't read to you?

A. No sir, I didn't read it, nor you didn't read it.

Q. Did you?

A. No.

Q. Do you usually sign papers without reading them?

A. I did that time. It was the first time I did it, and it will be the last time. I didn't know anything about law business.

* * *

Q. You are very particular about what you sign, aren't you?

A. I will be after this.

Q. I had been attorney for you when you were administratrix for your sister's estate, hadn't I?

A. Yes sir.

Q. And you were always very careful, weren't you, to see that everything was all right?

A. I guess there wasn't very much signing to do.

Q. You were always very careful and wanted everything explained?

A. *I didn't ask for an explanation in this — I just signed it. I was in a hurry, and you didn't read it to me, and I didn't ask what it was.*

Q. Didn't I tell you, Mrs. Morrison, that this far more than pays you for the money you were out in paying your witnesses?

A. No sir, you didn't Mr. Boothe.

Q. You came in there and got the hundred dollars and got out?

A. *I did. That is just about all, except I signed that paper.* I didn't stop to talk or exchange questions, one way or the other.

\* \* \*

Q. Were you satisfied with a hundred dollars?

A. Well, I thought it was a little better than nothing.

Her husband's idea of how a lawyer should conduct a trial may be gathered from his evidence:

"Q. You didn't like Judge Kanzler's decision against you?

A. No, I didn't.

Q. Your quarrel at that time was against Judge Kanzler's decision?

A. I had nothing against Judge Kanzler, only I thought it was an awfully raw decision.

Q. What did you think of Mr. Boothe's services up to that time?

A. \* \* \* What do you mean?

Q. Was it satisfactory?

A. I figured if Mr. Boothe won the case he would get paid, and if he didn't win it he wouldn't get paid.

Q. Did he conduct the trial to your satisfaction and to the satisfaction of your wife?

A. No, he didn't.

Q. He didn't?
A. No, he didn't.

\* \* \*

Q. Don't you think Mr. Boothe had made any effort, or used any endeavor in getting that money from the estate? Is that your contention now?

A. No. The only objection to Mr. Boothe, I guess he done the best he could, \* \* the only objection,—he was selfish,—every attorney goes in and looks around over the victim and gets what he can and I didn't think Mr. Boothe was near aggressive enough and didn't pitch in enough.''

Mrs. Morrison further claims that the arrangement made by the administrator with Mr. Boothe was not a compromise or a settlement, but merely a gesture of good will on the part of the administrator and heirs of the H. Cully estate. This claim is flatly contradicted by the attorneys for the administrator who testified that the settlement was made in order to have the money released by the circuit court, and to remove any doubt as to its distribution. By accepting a portion of said money, Mrs. Morrison ratified the action of the attorney bringing about the settlement.

Mr. Boothe testified that he notified Mrs. Morrison that he had arrived at a settlement of the case and invited her to come to his office for a settlement with her. At that time he testified that he offered to go into all the details of the settlement.

''Q. You are positive in your own mind that at the time you handed her that currency, at the time she was up there about it,—she was pleased with the settlement and told you that all the rest you could get was all right for you to have?

A. She was delighted. She didn't want to know about the settlement. She said, 'I don't care what you get. I got more than I expected to get.' I never thought of such a thing as her coming back at me.''

He further testified that she read the receipt he had given her and understood its contents.

"She said she had settled with him for $5.00 (referring to the expert witness on the trial). She denies it here. She told me that. She read that receipt. Don't fool me about that old woman. She is smart enough. She knows what she is doing. She understood it absolutely, perfect."

The court is not concerned with how petitioner divided the money he claimed as his fee. The fact remains that he failed to disclose to his client the amount he received in the settlement of the case.

It appears that petitioner has been a practicing lawyer for 47 years, and that heretofore he has borne an honorable reputation; that no complaint has ever been made, before the instant one, to any grievance committee for misconduct as an attorney or for unprofessional conduct. However, it would have been a very easy matter for petitioner to have written his client a letter, and given her a statement in writing as to what was received in the settlement, and what he claimed as a fee; it would have avoided all suspicion of unfairness.

We are persuaded that the recommendation of the Trial Committee who heard the testimony, and observed the demeanor of the witnesses on the stand, was sufficiently severe and therefore adopt the same.

An order will be made that petitioner be and hereby is reprimanded and be placed on probation for the period of one year, in the meantime this complaint be not dismissed; during the period of probation any proven act of misconduct on his part will be sufficient to revive the charges herein.

It is so ordered.

Rand and Rossman, JJ., dissent.